The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR21-193 RSM |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| SABRINA TAYLOR, | |
| Defendant. | |

Over at least a five-year period, Taylor defrauded and exploited those that cared about Taylor the most of more than $600,000. Taylor's scheme was simple, but insidious: cultivate an emotional connection with her victim, devise/repeat false hardships, engender sympathy, empathy, and compassion, and then prey upon these best of human emotions.

Based upon her years-long scheme, Taylor pleaded guilty to one count of Wire Fraud in violation of 18 U.S.C. § 1343.

A substantial sanction is warranted and necessary in this matter given the duration of Taylor's scheme, the number of victims that Taylor defrauded, and the means that Taylor used to execute her scheme. The government therefore joins the recommendation of U.S. Probation that Taylor be sentenced to a term of imprisonment of twenty-seven months, with three years of supervised release to follow. The government also requests that,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

consistent with parties' agreement, the Court order restitution to Taylor's victims in the total amount of $608,975.

## I.   FACTUAL BACKGROUND

Beginning no later than April 2014, and continuing through at least July 2019, Taylor defrauded at least ten individuals—with whom Taylor had formed romantic and platonic relationships—of funds totaling at least $608,975.

Taylor exploited the platonic and romantic relationships that she had with her victims by obtaining "loans" from them for expenses related to myriad false and nonexistent hardships. Among the most common false hardships claimed by Taylor were: that she had multiple sclerosis and needed money for necessary treatment (Taylor does not in fact have multiple sclerosis; from 2009 to 2018, Taylor had been assessed by multiple providers and each had advised Taylor that she did not have multiple sclerosis; and, in August 2018, Taylor was dismissed from her primary care physician's practice because Taylor had forged a letter—purportedly signed by her primary care physician—indicating that Taylor had been diagnosed with "Secondary Progressive Multiple Sclerosis"), that she was enrolled at the University of Washington and needed money to pay tuition (Taylor briefly attended the University of Washington in Summer 2014, paid the University of Washington a total of $76.00, and had no outstanding tuition owed to the University of Washington during the time she executed the subject scheme), and that she had a brother who was in jail and needed money to pay his bail (though Taylor's brother had been briefly incarcerated in 2009, this period of incarceration predated the instant scheme to defraud).

Taylor also falsely represented to her victims that she would have the means to repay these "loans," falsely claiming: that she anticipated a settlement from a lawsuit against Chase Bank (Taylor has never had any pending lawsuit against JPMorgan Chase, N.A., or its affiliates), that she worked at either Fred Hutchinson Cancer Research Center or the University of Washington and would repay the "borrowed" funds via wages earned (Taylor was never a paid employee of Fred Hutchison or the University of Washington, and did

Sentencing Memorandum - 2
*United States v. Sabrina Taylor*, CR21-193 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

not have any employment for the majority of the time that she perpetrated her fraudulent scheme); or that her parents would give her the money to pay back the loans (Taylor had a strained relationship with her parents and Taylor knew that they were not a potential source of funds to repay the money of which she defrauded her victims).

These false claims of hardship and fictional means of repayment caused Taylor's victims to give her funds totaling at least $608,975.

One of Taylor's victims was J.N. In early 2015, Taylor posted a public status update on Facebook indicating that she was going through a difficult time. After J.N. commented on Taylor's public post, Taylor sent a private message to J.N. asking him for $600 for a security deposit on a new apartment—claiming that Taylor had been receiving threats and, as a result, her landlord and roommate wanted her to move out of her current apartment (when in fact Taylor was being evicted for not timely paying her rent). Taylor falsely assured J.N. that she had just received a settlement from Chase and would be able to pay back J.N. in April or May 2015. On or about March 30, 2015, J.N. provided Taylor $600 via PayPal electronic transfer.

Over the next three-plus years, Taylor obtained from J.N.—via sixty-seven additional PayPal, check, or cash payments—"loans" for nonexistent medical treatment, fictious tuition payment, and to purportedly pay her brother's bail, who as noted, was not incarcerated at the time these funds were obtained. Taylor's exploitation and abuse of her supposed friendship with J.N. reached its peak in January 2017, and continued until May 2018, when—during this period—Taylor defrauded J.N.—on average—of more than $18,000 per month.

All told, beginning in March 2015, and continuing until May 2018, Taylor defrauded J.N. of $556,085.

Another of Taylor's victims was J.B. Taylor met J.B. on the dating website "OKCupid" in October 2017. In February 2018, Taylor falsely represented to J.B. that she needed $3,200 to pay rent, claiming that she had used her rent money to pay for intravenous

multiple sclerosis treatments and to bail her brother out of jail. Taylor further falsely claimed that she would repay J.B. via a purported $23,000 bonus that Taylor claimed she would receive from her employer in April 2018. These false claims and misrepresentations caused J.B. to write Taylor a $3,200 check. Moreover, on three other occasions, Taylor defrauded J.B. of an additional $4,500. After repeated requests from J.B. for Taylor to repay the $7,700 that had been "loaned" to her, Taylor paid J.B. a total of $25.00.

In addition to J.N. and J.B., Taylor's also defrauded the following individuals—who were all friends or acquaintances of Taylor's—in the following amounts:

| Name | Amount |
|------|--------|
| K.K. | $14,432 |
| S.B. | $11,200 |
| B.R. | $6,391 |
| L.W. | $5,750 |
| G.W. | $5,242 |
| F.S. | $1,400 |
| A.P. | $500 |
| B.D. | $300 |

With respect to each of her victims, Taylor developed purported trusting relationships, fabricated false hardships, and then preyed upon feelings of empathy, platonic friendship, or romantic interest—taking money from her victims for as long as she could convince them that she was in legitimate need of their support and could pay them back.

While Taylor represented to her victims that these funds would be used for medical treatment, higher education, or to help her family, Taylor in fact used these funds on items of self-indulgence. For example, from 2016 – 2018, Taylor withdrew at least $74,700 in cash from her checking accounts, spent at least $59,790 on travel—to include multiple trips to Japan and Korea, made $37,746 in online purchases from Amazon and Etsy, spent $29,486 on clothing, and purchased $15,976 in makeup.

Sentencing Memorandum - 4
*United States v. Sabrina Taylor*, CR21-193 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## II.    GUIDELINES AND PLEA AGREEMENT

Pursuant to the plea agreement, and consistent with the Presentence Investigation Report (PSR), the parties have agreed that the following Guidelines factors apply to this case:

- A base offense level of 7 under USSG § 2B1.1(a)(1);

- A fourteen-level increase under USSG § 2B1.1(b)(1)(H) because the loss exceeded $550,000, but was not greater than $1,500,000;

- A two-level increase under USSG § 2B1.1(b)(2)(A)(i) or (iii) because the offense involved 10 or more victims *and* resulted in substantial financial hardship to one or more victims;[1] and

- A three-level decrease under USSG § 3E1.1(a) and (b) for acceptance of responsibility.

Dkt. 33 at ¶ 9; PSR at ¶¶ 28-36. Based upon these Guidelines factors, the total offense level is 20. PSR at ¶ 37.

Taylor has no prior convictions and has a criminal history score of I. *Id*. at ¶ 40. Based upon an offense level of 20, and a criminal history score of I, the resulting advisory Guidelines range is 33 to 41 months. *Id*. at ¶ 102.

As part of the plea agreement, the United States agreed to recommend that the Court sentence Taylor to a term of imprisonment no greater than twenty-seven months. Dkt. 33 at ¶ 11. The plea agreement does not contain any limitation on Taylor's sentence recommendation.

## III.    RECOMMENDATION AND JUSTIFICATION

The government is recommending a custodial sentence of twenty-seven months with a three-year term of supervision to follow. This recommendation is appropriate

---

[1] While the instant offense conduct involved both 10 or more victims and resulted in financial hardship to one or more victims, either circumstance—alone—would be sufficient to trigger the two-level enhancement under USSG § 2B1.1(b)(2)(A).

Sentencing Memorandum - 5
*United States v. Sabrina Taylor*, CR21-193 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

considering the factors set forth in 18 U.S.C. § 3553(a). Specifically, the requested sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes of the defendant.

### 1.     Nature and Circumstances of the Offense

Unlike many fraud schemes, Taylor did not execute her scheme in anonymity. Rather, Taylor was known to her victims—as a friend or a romantic interest. Indeed, Taylor's scheme was particularly insidious because it exploited the very best of human emotions. Taylor's own words, where she manipulatively uses the same tactics with each of her victims, best demonstrates the egregious nature of the offense conduct:

Communication with S.B., April 16, 2014:
Taylor: I am bad at this and you are busy. . . I would be putting the car in your name. I know that doesn't make a difference but I realized that it sounds 3% less horrible when that was part of it. I honestly suck because I *hate myself so much* for being in this situation [of needing a loan]. And then asking. (emphasis added).

Communication with A.P., February 19, 2015:
Taylor: *I feel like the worst human being alive* but I am not sure what to do. I'm so sorry Chase sucks so much and I talked to my lawyer and he filed suit for me so it's all official. I'm beyond exhausted and *I feel like I'm failing as a person*...I am trying to sell my sewing machine because I'm out of bus money until the end of the month. (emphasis added).

Communication with B.L., February 24, 2015:
Taylor: Ok. So I need help, I need a loan. I know it's a lot to ask I'm on my knees and I need help. . . *I'm sobbing while I'm writing this. I feel like such a jerk for asking* but I don't know what to do. I hired a lawyer and I have a court case date and I swear as soon as they settle I pay you back every dime. . . I need about $5200. Which is what chase *stole* from me. (emphasis added).

Communication with F.S., March 3, 2015:
F.S.: I can totally loan you some cash too. Sorry to hear about your difficulties! Thanks for being vulnerable and asking for help, I know how hard it can be.
Taylor: Wait. What? Really? Seriously? *You're going to make me cry*.
F.S.: Yeah no worries! Certainly sounds like you need one less thing to worry about right now :).

Sentencing Memorandum - 6
*United States v. Sabrina Taylor*, CR21-193 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Taylor: [Y]ou're. amazing. *I don't even know what to say*.
F.S.: Don't have to say anything ;). (emphasis added).

Communication with L.W., March 4, 2015:
L.W.: I can give you the full amount and you can borrow my car too.
Taylor: *You are going to make me cry like a freakig (sic) baby*....are you serious?!
L.W.: Yeah!
Taylor: *I'm literally crying. I don't know what to say*.
Taylor: its no trouble! (emphasis added).

Communication with J.N., April 13, 2015:
Taylor: Hey, [J.N.] - I'm on my way to the hospital as my stress is giving me chest pains. . . *I hate to ask but I do need to take you up on your offer*. Everything else has fallen through. I will have everything paid back by May 20th and I am so sorry to ask. I need to borrow $2300. *That will be the last amount I borrow from you* and I am HAPPY to send any documents you like. I will probably be out of reach for a few hours but I'll check my phone. I just....it's too much. :-). (emphasis added).

Communication with J.B., March 23, 2018:
Taylor: *I feel super uncomfortable borrowing more money from you* and my one other friend who owes me money [deleted] can't pay me back yet. I don't know what to do. Tell me what to do.
J.B.: Let me lend you the money and take care of you today.
Taylor: I.... *promise me you won't think less of me*?
J.B.: Of course.
Taylor: Why are you so nice to me? I love you....*I feel awful and I'm trying not to. I'm so sorry you are helping me again*.
J.B.: Don't feel bad on my behalf love . . . But you're gonna pay me back by June right? (emphasis added).

Communication with J.N., May 29, 2018:
*I am going to commit myself after I meet with you and so I'm worried*. I'm trying to hold on until then. Hello? *I'm in the ambulance*. Can you please just respond so I know what's going on? Are you mad at me now? Did I do something?[2] Please. I am worried sick. I can't lose another friend and especially you. (emphasis added).

---

[2] J.N. made his/her last transfer to Taylor on May 8, 2018. When Taylor asked J.N. if he/she was "mad" at Taylor, or Taylor had done "something," Taylor had already defrauded J.N. of $556,085.

Sentencing Memorandum - 7
*United States v. Sabrina Taylor*, CR21-193 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Communication with K.K. March 2, 2019:

So I don't know what to do. You're worried, *I'm worried and my parents are worried* but I don't know what to do. I can pay the loan payment on the 15. But that doesn't change what I owe. I have until the 5th to pay up. . . I understand if you cannot or do not want to help. I really do. The only way I can guarantee paying you back is by the lawsuit payment I am getting at the end of April. That's all I've got. Really. (emphasis added).

**2.      Taylor's History and Characteristics**

Taylor has no prior convictions, and this is her first contact with the criminal justice system. As detailed in the PSR, Taylor—no doubt—faced some significant challenges when she was growing up. And, as an adult, Taylor has struggled with both mental health and substance abuse issues. Though the government acknowledges that Taylor's personal characteristics may be somewhat mitigating, the government submits that nothing in Taylor's background sufficiently explains, or substantially predisposed her to commit, the instant offense conduct. Moreover, that Taylor has faced challenges in her life—and according to her report—was physically abused by her mother and received less-than-optimal emotional support from both her parents is also somewhat aggravating. Instead of empathizing with her victims—many who faced substantial, though perhaps different, challenges themselves—Taylor purposefully and repeatedly exploited her victim's very human need for acceptance, friendship, and romantic affection.

**3.      Promotion of Respect for the Law, Deterrence, and Just Punishment**

Given the scope and duration of Taylor's conduct, the requested sentenced is needed to promote respect for the law and to deter Taylor from committing future crimes. Moreover, given the financial and emotional impact upon Taylor's victims, the need for just punishment is particularly implicated in this matter.

As noted in the victim impact statements submitted to the Court, Taylor's scheme effected financial hardship on multiple victims, their families, and those that would have otherwise been the beneficiary of their generosity. For example:

Sentencing Memorandum - 8
*United States v. Sabrina Taylor*, CR21-193 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

J.N.: "The amount of money that Sabrina took, over time, substantially large. The damage would have even worse, since she didn't really stop asking for more – something would just come up that would require more funds."

K.K: "I had approximately $15k in a savings account while working two jobs, 6 days a week for over two years . . . my plan for those funds was to move to Los Angeles [to start a new career];

J.B.: "I had to postpone buying a house because of it. I was not able to put as much of a down payment on the house when I did finally buy one, which affects my mortgage payment."

A.W.: "My father delayed his retirement for over a year to help me pay back what I borrowed on Sabrina's behalf."

S.B.: "Her fraud more than depleted that [charitable] budget for the year, and I was not able to help people in our community as I otherwise would have."

Moreover, given that the offense conduct involved a complete violation and exploitation of the victim's trust in, and feelings—platonic or romantic—for Taylor, the offense conduct had substantial emotional consequences too:

K.K.: "I've kept both the financial and emotional turmoil from my family and friends out of shame."

A.W.: I spent several thousand dollars on therapy following the financial and emotional abuse of [Taylor] and the resultant trauma contributed to my recent divorce.

S.B.: "Once I recognized the fraud, it also made me more reluctant to give in the way I had in the past. It's taken me years to get over this betrayal of trust."

## IV.    CONCLUSION

This is Sabrina Taylor's first criminal offense. She cannot, however, be considered a novice at fraud. From no later than April 2014 until at least July 2019, Taylor carried out an extensive fraud scheme using deceit and deception that preyed upon humankind's better angels. Several of Taylor's victims suffered substantial financial hardship—some likely will never be made whole financially. Equally as important, Taylor exploited and betrayed

Sentencing Memorandum - 9
*United States v. Sabrina Taylor*, CR21-193 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the trust of each of her victims and many of Taylor's victims will continue to pay an emotional toll for many years to come.

A sentence of twenty-seven months confinement, a three-year term of supervised release, and restitution of $608,975, appropriately holds Taylor accountable for the scheme she visited upon the people who trusted her, cared about her, and indeed loved her.

Dated this 20th day of January, 2023.

NICHOLAS W. BROWN
United States Attorney


*/s/ Joseph C. Silvio*
JOSEPH C. SILVIO
Assistant United States Attorney
700 Stewart Street, # 5220
Seattle, Washington 98101
Telephone: (206) 553-7970
Email: joseph.silvio2@usdoj.gov

Sentencing Memorandum - 10
*United States v. Sabrina Taylor*, CR21-193 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970