1          UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON AT SEATTLE

2    _____

3                              )
     UNITED STATES OF AMERICA,  )
4                              )  CASE NO. CR21-193-RSM
                   Plaintiff,   )
5                              )  Seattle, Washington
     v.                         )
6                              )  January 27, 2023
     SABRINA TAYLOR,            )
7                              )  10:06 a.m.
                   Defendant.   )
8                              )  Sentencing
                               )
9    _____

10            VERBATIM REPORT OF PROCEEDINGS
       BEFORE THE HONORABLE RICARDO S. MARTINEZ
11             UNITED STATES DISTRICT JUDGE

12   _____

     **APPEARANCES:**

13

14    For the Plaintiff:      JOSEPH CARL SILVIO
                              United States Attorney's Office
15                            700 Stewart Street, Suite 5220
                              Seattle, WA 98101
16
      For the Defendant:      GREGORY GEIST
17                            Federal Public Defender's Office
                              1601 5th Avenue, Suite 700
18                            Westlake Center Office Tower
                              Seattle, WA 98101
19

20    United States           SARA MOORE
      Probation Officer:
21

22

23    Reported by:            MARCI E.C. CHATELAIN, CCR, RPR, RMR,
                              CRR, Federal Court Reporter
24                            700 Stewart Street, Suite 17205
                              Seattle, WA 98101
25                            marci_chatelain@wawd.uscourts.gov

1                    PROCEEDINGS
2      _____

3           THE CLERK:  The United States District Court for the
4      Western District of Washington is now in session, the Honorable
10:06:20  5      Ricardo S. Martinez presiding.
6           THE COURT:  Good morning.
7        You may all be seated.  Thank you.
8           THE CLERK:  We're here on the matter of the United
9      States versus Sabrina Taylor, case number CR21-193, assigned to
10:06:33  10      this Court.
11        Counsel, will you please make your appearances for the
12      record?
13           MR. SILVIO:  Good morning, Your Honor.  Joseph Silvio
14      on behalf of the United States.
10:06:41  15           THE COURT:  Counsel?
16           MR. GEIST:  Good morning, Your Honor.  Greg Geist from
17      the Federal Defender's Office at the table with Ms. Taylor.
18           THE COURT:  And, Mr. Geist, Ms. Taylor, thank you.
19        Counsel, as you're quite aware, we're here for sentencing
10:07:03  20      on a single count of wire fraud.
21        Let me indicate for you and for our record exactly what the
22      Court has received and reviewed prior to this hearing.
23        The Court has received the Plea Agreement of the parties,
24      the government's sentencing memo, the order of forfeiture, the
10:07:34  25      defendant's sentencing memorandum with the exhibits.  Court has

1    received multiple victim impact statements.  Court has received

2    the release status report filed by U.S. Probation Officer Dan

3    Acker.  And finally, the Court has received and reviewed the

4    presentence investigation report filed by U.S. Probation Officer

10:08:05  5    Sara Moore.  Ms. Moore is present in the courtroom with us, as

6    well, this morning.

7         Trusting the parties have had the same opportunity as the

8    Court to review all of these materials, Mr. Silvio, if I could

9    have the government's recommendation, first of all.

10:08:24  10         MR. SILVIO:  Good morning again, Your Honor.

11         Friends are defined by what we do when things aren't easy.

12    That's a quote attributed to one of Ms. Taylor's friends from

13    her 2013 GoFundMe page.

14         And in that GoFundMe page, Ms. Taylor referenced that she

10:08:55  15    had multiple sclerosis, that she had a number of issues that she

16    was working through.  And those are the same things that the

17    Court is presiding over today and the facts of the instant wire

18    fraud charge and the scheme that Ms. Taylor perpetrated over at

19    least five years.

10:09:23  20         And the reason why the government led with that quote from

21    the GoFundMe page, Your Honor, is because that's what this case

22    is about.  This case is about what friends do when their friends

23    are in need and what Ms. Taylor did as it relates to her

24    friends.

10:09:39  25         And what Ms. Taylor did is over a period of five years, she

1   put her pain and her needs above those of her friends and,

2   indeed, those of her romantic interests.

3        And as the government noted in its sentencing memo, Your

4   Honor, that's what the government finds so particularly

5   egregious and problematic about this case.  This wasn't a hacker

6   sitting in anonymity in a foreign land.  This wasn't somebody

7   that was going and stealing checks out of a mailbox and

8   depositing them in a bank.  And certainly, those are serious

9   crimes, Your Honor.  But what makes this case different and why

10  this case merits what the government acknowledges is a

11  substantial sanction, given Ms. Taylor's personal

12  characteristics, is the manner in which this fraud was

13  perpetrated and the course of conduct and the duration of the

14  fraud.

15       And as I closed in my memo, Your Honor, the harm in this

16  case is clearly quantifiable in terms of a restitution order.

17  And Ms. Taylor will have to pay her victims back with, you know,

18  her hard work over the years to come.  And whether she's able to

19  ever fully make her victims whole is -- certainly remains to be

20  seen, and we don't know.

21       But in some ways, Your Honor, what is more problematic and

22  what the victims may never recover from is that feeling of is

23  this real, is this interaction that I'm having with somebody, is

24  this real, or is this somebody that is very skilled and very

25  calculating that can manipulate me into believing that they're

1  in need, that they are my friend, and that I should part with my

2  hard-earned money.

3      And as the Court indicated, the Court has reviewed the

4  victim impact statements.  It is, in the government's mind, the

5  psychological and emotional impacts of this case that

6  distinguish it from many cases that we -- that the Court

7  typically might see.

8      And, Your Honor, because of the manner in which this fraud

9  was perpetrated, the government has focused on the words, Ms.

10 Taylor's words and her victims' words.  And the government just

11 laid out just one excerpt, to the best that it could, that

12 demonstrated the exchange between Ms. Taylor and her victims.

13     And what was, I'm sure, apparent to the Court, Your Honor,

14 is that regardless of who the victim was, the pattern and the

15 words used, and the surprise that Ms. Taylor feigned when

16 somebody said that they would help her, was the same.

17     And also, as evidenced by the timeline of when Ms. Taylor

18 used those words, there were multiple individuals that Ms.

19 Taylor was attempting to defraud at the same time within days of

20 each other, literally, as noted in the memo, Your Honor, just

21 about the same words used with different victims.

22     And so the government certainly recognizes that Ms. Taylor

23 was in pain and that she had a childhood that was unfortunate,

24 and it's well documented in the PSR, the struggles and the abuse

25 that Ms. Taylor suffered, but the government cannot square those

 1   two.  One does not equate to the other, in the government's

 2   mind.  And this wasn't a single one-off, this was a sustained

 3   course of conduct.

 4        And just as the government can't square Ms. Taylor's

10:13:35   5   conduct based upon what she suffered as a child or even based

 6   upon who she was born in this world, the government also doesn't

 7   see that a substance abuse problem particularly mitigates the

 8   offense conduct.  Clearly, Ms. Taylor was lucid enough and had

 9   her faculties such that she could manipulate multiple different

10:14:03   10   individuals.  And indeed, in her statement to the Court, Ms.

11   Taylor has endorsed five years of sobriety.  And just going back

12   five years, we're talking early 2018 or late 2017.  And as

13   evidenced by the government's sentencing memo and the statement

14   of facts in the Plea Agreement and in our memo, there were

10:14:24   15   continued victims during a period of what Ms. Taylor states is

16   sobriety.

17        So the government doesn't necessarily -- certainly, it

18   understands that substance abuse was a contributing component

19   here, but it doesn't excuse the conduct, and certainly not the

10:14:42   20   conduct when Ms. Taylor was sober.

21        The government also has -- I mean, commends Ms. Taylor for

22   doing some hard work while she's on pretrial release.  And the

23   government will credit that, and the government doesn't have any

24   reason to doubt Ms. Taylor's earnest attempts at addressing her

10:15:08   25   demons and making amends with her victims.

1     That said, Your Honor, and I don't want to be contradictory

2  here, but Ms. Taylor's victims have heard these same statements

3  before.  In fact, in that 2013 GoFundMe page, Ms. Taylor stated,

4  I firmly believe that my purpose in life is to help others move

10:15:33   5  out of the darkness and find what makes them shine.  And that

6  strikes the government as very similar to the sort of statements

7  that Ms. Taylor has endorsed recently in her letters to the

8  Court.

9     And the government hopes that Ms. Taylor has really, truly

10:15:50   10  turned that page and can move forward whether she is on

11  probation or whether she is on supervision, whenever that time

12  is, that she can move forward and continue to address her

13  underlying issues and also make amends with her victims.

14     But I think it would be -- Ms. Taylor's victims would be

10:16:13   15  right to be somewhat skeptical, given their past experiences

16  with her.

17     Your Honor, the government didn't anchor their sentencing

18  recommendation to the guidelines here.  The government regularly

19  looks at, as the Court does, the individual facts of each and

10:16:38   20  every case.  And certainly, the guidelines give us a starting

21  point.  But if the government had thought that a 20-month

22  sentence was appropriate, the government would have recommended

23  a 20-month sentence.  The guidelines didn't drive the

24  government's recommendation here.  What drove the government's

10:16:55   25  recommendation is, as I've indicated, the type of conduct, the

1    duration of the conduct, and the number of victims, and the

2    emotional impact.

3        And along those lines, defense has suggested that the

4    government's recommendation, in addition to being anchored to a

5    specific guidelines range, that a sentence of 27 months would

6    result in sentencing disparity.  And the defense noted a number

7    of cases.  The government would say that those cases are, as

8    each case is, unique and different.  And but for one of 'em, the

9    course of conduct in those cases was over less than a year.

10       There are a couple other cases the government finds to be

11   more comparable, one before Judge Jones and one before Your

12   Honor where they were fraud cases, one involved aggravated

13   identity theft.  But the one before Your Honor was a bookkeeper,

14   wire fraud, position of trust over a period of four years, and a

15   restitution amount of $607,000.  And in this case, we're off by

16   -- we're a thousand dollars over that.  In that case, the

17   government recommended 30 months, the Court sentenced that

18   individual to 20 months.

19       And where the right sentence is in that -- and obviously,

20   that's the Court's decision, but the government does believe

21   that a 27-month sentence is entirely consistent with the types

22   of sentences that are adjudged in this district as it relates to

23   this type of conduct in somebody similarly situated as Ms.

24   Taylor.

25       The last thing that the government wants to address, Your

1    Honor, is the notion of Ms. Taylor's gender and the Senate

2    subcommittee report that recently came out in December of 2022.

3    And certainly, when the government saw that and the government

4    reviewed it, the government's first response is anger, is

10:19:03  5  outrage, and the response is, we have to do better to those

6    individuals that are in the custody of the government serving a

7    custodial sanction.

8         No doubt, there is no excuse for that.  And those

9    individuals that committed those abuses and those assaults

10:19:24 10  rightfully were sanctioned.  And one of the main, driving facts

11   or the underlying information that came -- that was used in the

12   report were the prosecutions from the various U.S. Attorney's

13   Offices in those districts where those offenses occurred.

14        And certainly, the U.S. Attorney's Office cannot guarantee

10:19:50 15  Ms. Taylor's -- the conditions of Ms. Taylor's conduct.

16   Certainly, we cannot guarantee that some individual that has

17   been charged with the custody and care of somebody is not going

18   to commit a criminal act.  But what the U.S. Attorney's Offices

19   can do at large is when those actions happen, then we can punish

10:20:09 20  those individuals.

21        The notion that Ms. Taylor would be abused in custody is

22   something the government takes very seriously and will not

23   dismiss it.  But in the final analysis, Your Honor, the

24   government falls back onto the actual harm that has occurred in

10:20:33 25  this case, what has actually been done, and the people who

1    actually have suffered consequences, and those are Ms. Taylor's

2    multiple victims.  And it is for those reasons, the impact on

3    the victims as stated in our memo and as detailed in the factual

4    statement in the Plea Agreement, it is those victims that the

10:20:59    5    government believes a substantial sanction is necessary to

6    vindicate their interests.  The government believes the 27

7    months is an appropriate sanction for Ms. Taylor, Your Honor.

8    The government also would ask the Court to incorporate in

9    the judgment and sentence the preliminary order of forfeiture

10:21:21    10    that the Court referenced at the beginning of the hearing.

11    And subject to any questions from the Court, that is the

12    government's presentation.

13    I do know that there are at least two individuals that

14    would like to address the Court.

10:21:32    15    THE COURT:  Thank you, Mr. Silvio.

16    I did read all of the Victim Impact Statements in this case

17    submitted already, but, obviously, any victim present or even, I

18    think, we might have some people listening on the phone, is more

19    than welcome to address the Court.

10:21:50    20    So let's take that up now before we turn to Mr. Geist's

21    presentation.

22    Good morning.

23    MR. WARD:  Good morning.

24    THE COURT:  If you don't mind giving us your name, and

10:22:12    25    spell your last name for our reporter.

1          MR. WARD:  My name is Aaron Ward, last name W-a-r-d.

2          THE COURT:  Thank you, Mr. Ward.

3          MR. WARD:  I have a prepared statement that I

4    submitted, I would like to read it.  There's a couple things I

5    added.

6          THE COURT:  No problem.  Just let me ask you this.

7          MR. WARD:  Yes, sir.

8          THE COURT:  People speak a lot faster than our court

9    reporters can keep up sometimes, especially when they read.

10          MR. WARD:  Uh-huh.

11          THE COURT:  So just slow your pacing down, and you're

12    more than welcome to read it.

13          MR. WARD:  Yes, Your Honor.

14       My name is Aaron Ward, and I appreciate this opportunity to

15    address the Court about how the defendant's actions have

16    affected my life in the long-term.

17       Firstly, from a pure financial perspective, I will probably

18    be paying back my parents for the rest of their lives.  My

19    father delayed his retirement for 12 to 18 months in order to

20    help me transition my life away from Sabrina.

21       It has taken me the past decade to recover my credit

22    ratings back to where they were before we had met.  I have spent

23    thousands of dollars in co-pays, bills, and prescriptions as

24    part of still ongoing psychiatric therapy.

25       Also, while we were together, my Eagle Scout ring magically

1    disappeared off of my nightstand.  And the defendant informed me

2    that maybe the fairies took it away.

3        The defendant would regularly threaten to commit suicide if

4    I didn't come up with hundreds or thousands of dollars that day.

5    I sold almost everything I had with monetary value to try and

6    fulfill these demands.

7        I also thoroughly indebted myself to payday lenders and,

8    basically, everyone that I could once my credit had been

9    exhausted.

10       When suicide was no longer an effective tool of

11   manipulation, she would threaten to take our elderly dog to a

12   kill shelter.  Once she did this while I was at a Cincinnati

13   Reds game and basically made me have a breakdown in front of

14   30,000 people.

15       More than the financial costs have been the emotional and

16   social repercussions of my association with Sabrina.  I had to

17   cancel being in my cousin's wedding because I couldn't afford

18   the 200 bucks to rent the tuxedo.

19       My relationship with my immediate family has been

20   permanently tainted.  My mother used to dread my phone calls

21   because 90 percent of the time they were because the defendant

22   had taken themselves hostage and was demanding money [sic].

23       The trauma of the defendant's financial and emotional abuse

24   led directly to my recent divorce.  The depression I have been

25   struggling with has been a major factor in my difficulties

1    holding down a job in my current field.  I have also skipped

2    going to conventions and social gatherings on the off chance I

3    might run into her in public and be triggered into having an

4    emotional response.

10:26:28  5        I feel somewhat responsible for the defendant's ability to

6    infiltrate the local pagan and nerd communities to find fresh

7    victims.  Several of them were met because they were

8    acquaintances of mine.

9        Her choice of multiple sclerosis as a false diagnosis was

10:26:53  10   clearly a play to get more money out of my father whose own

11   father suffered and eventually succumbed to that same illness.

12       She would also often borrow money from friends and

13   acquaintances without my knowledge on the say-so that I would

14   cover it, that I would pay -- that I would pay them back if they

10:27:17  15   didn't trust her to compensate.

16       Finally, Sabrina's lies and behavior after I left her was a

17   pure smoke screen to obfuscate her misdeeds.  She told people

18   that I beat and threatened her.  She told people that my stepson

19   was the result of me cheating on her.  This caused people to

10:27:51  20   shun me and not to believe me when I warned themselves -- when I

21   warned them about involving themselves monetarily with her.

22       I skipped my priest Pete Pathfinder Davis's funeral because

23   I was concerned that someone would try to physically confront me

24   over these falsehoods.

10:28:20  25       She has not shown any contriteness for her actions, going

January 27, 2023                14

1    as far as to call her ill-gotten gains reparations.

2        Furthermore, I saw no evidence of any cocaine usage for

3    almost the six years we lived together.

4        I am not a psychologist, but it is my sincere belief that

10:29:07    5    the defendant is a narcissistic sociopath.  The pattern of

6    manipulations, behavior, and then smoke screens when -- and then

7    smoke screens and cutting people off from their communities was

8    a -- you know, it's a clear systemic pattern that, you know,

9    predates the charges before the Court today.

10:29:43    10        For all of these reasons and more that I didn't have time

11    to include, I urge the Court to impose the maximum possible

12    sentence.

13        THE COURT:  Thank you.

14    Good morning.

10:30:07    15        MR. BALUKOFF:  Good morning.

16        THE COURT:  If we could have your name.  Spell your

17    last name for our reporter.

18        MR. BALUKOFF:  Yeah.  My name is Stephen Balukoff.  My

19    last name is spelled B-a-l-u-k-o-f-f.

10:30:20    20        THE COURT:  And what would you like to say?

21        MR. BALUKOFF:  Well, again, I also prepared a written

22    statement.  Never done one of these in a court before, so I'll

23    try to speak slowly.  And I'm not -- haven't added anything to

24    the statement I already submitted.

10:30:35    25        For many years, I have maintained a yearly budget for

1  charitable causes.  Sometimes I use this money to support actual

2  501(c)(3) organizations, but more often than not, I found myself

3  simply giving money to people within or adjacent to my friend

4  network who are down on their luck or have problems that a

10:30:59  5  relatively small amount of money can solve and have no other

6  place to turn.

7      In the past, I have used this money to help others pay

8  power or heating bills in the winter, pay for some emergency

9  medical bills, car repairs, or tuition, or book fees for

10:31:15  10  educational opportunities.

11      I tend especially to be interested in helping people with

12  educational opportunities as I feel that a good education can

13  make a difference for the rest of a person's life and improving

14  their lot in life.

10:31:31  15      When I was approached by Sabrina Taylor, I didn't actually

16  know her at all; rather, she had asked a third-party friend, and

17  at the time romantic partner of hers, to approach me.

18      The very first time I was approached, it was to help pay

19  off some creditors so she wouldn't be evicted.  The amount she

10:31:50  20  was asking for was relatively high compared to what I was used

21  to doing for people, but not yet beyond my budget, so I wrote

22  her a check and, without asking anything in return, accepted a

23  vague promise to pay me back someday.

24      However, a few months after that, she again came to me

10:32:06  25  asking for money to purchase a vehicle.  She spun me a story

1    about a potentially life-changing internship opportunity she had

2    a limited window to take advantage of in Eastern Washington

3    which entailed a lot of driving around and, therefore, she

4    needed a reliable private vehicle in order to take advantage of

10:32:27    5    the opportunity.

6        She wanted me to buy her a brand-new MINI Cooper.  Further,

7    she indicated that because of various unfortunate relationships

8    she was involved in in the past, and racism on the part of her

9    creditors, she would not qualify for even a small loan to buy a

10:32:44    10    car.

11        The amount she was asking for would have depleted my

12    charitable giving budget for several years; meaning, if anyone

13    else came to me for financial help in the meantime, I wouldn't

14    be able to help them.

10:32:58    15        I also explained to her that she didn't need a brand-new

16    vehicle for this internship, but that a reliable used vehicle

17    should be able to work just as well at around half the cost.  I

18    told her I would be willing to pay for a used vehicle, but even

19    at that dollar amount, it wouldn't be a gift, but a loan she

10:33:16    20    would need to be able to pay back over the next couple of years.

21        Over the course of several weeks, I spent many hours coming

22    to Sabrina's apartment with a mutual friend to go over her

23    budget, explain how credit and credit cards work, and otherwise

24    help her so that not only would she know what to do to be able

10:33:35    25    to pay back the loan, but also so she'd be a little wiser in how

1    to manage money and credit, as she seemed to lack this

2    knowledge, from what I could tell.

3        I also offered to help her with shopping for a reliable

4    used car and she declined that.

10:33:50    5        After I finally wrote her the check for the loan, I was

6    expecting her to start paying me back a few months later once

7    she started to get income from the internship.  I received no

8    payment at all.  All my attempts to contact her about it went

9    unanswered.

10:34:06    10        Later, I found out that she dumped and stopped talking to

11    the mutual friend and her former romantic partner who had

12    introduced us within a couple of months of my writing the check.

13        A few months after that, I was told by reliable people who

14    knew Sabrina that she had been seen driving around Seattle in a

10:34:24    15    brand-new MINI Cooper.

16        It finally occurred to me that Sabrina had taken advantage

17    of me and probably several other people in order to raise money

18    she needed to buy that car in cash; and that she had never

19    intended to pay me back; and that the internship story she had

10:34:41    20    told me was a complete fabrication.

21        This was devastating to me.  In the time that she had not

22    paid me back, I had had several opportunities to help people

23    financially in my community, but I couldn't afford to at the

24    time.

10:34:57    25        Sabrina's fraud against me has made me much more reluctant

1    to give loans of any kind, especially when they stretch my

2    budget.

3         What affected me the most was that I thought I had worked

4    with Sabrina enough to know the nature of her character.  I

5    thought she was sincere and that she was very hopeful in

6    improving her life and, potentially, career opportunities and in

7    very meaningful ways by taking advantage of what sounded like a

8    very promising internship opportunity.  I realize now that she

9    was just extremely adept at lying and acting and taking

10   advantage of people like me.

11        And this is what really disturbs me about her behavior.

12   Throughout this court case and investigating her crimes, I had

13   been able to hear from some of the other victims.  I understand

14   that I was by far not the person most hurt by her actions, that

15   she was able to bilk people out of far more money than I gave

16   her, and she was even willing to take money from people on

17   disability to go an a lavish vacation to Japan, money that they

18   needed to survive.

19        Further, I understand that she is in the habit of buying

20   expensive collectibles and sequestering them in storage units or

21   with family members.  I've even heard that she still has that

22   MINI Cooper stored at a friend's house.

23        I think Sabrina is expecting to get some kind of jail time

24   for her crimes, but has tried to hide these possessions away as

25   a nest egg for herself when she gets out of prison.

1    At this point I'm not really interested in being paid back

2  for what she stole from me.  I'm doing much better off than I

3  was in the days when she bilked me out of several thousand

4  dollars, but I'm worried about her potential future victims when

10:36:37  5  she's done serving whatever sentence the Court decides to give

6  her.

7    Sabrina comes across to me as narcissistic and selfish and

8  doesn't care who she hurts to get what she wants.

9    In any case, I don't think for a minute that she actually

10:36:51  10  regrets stealing from her many victims or the harm she has

11  caused to them but simply regrets getting caught.

12    I completely expect her to try to steal money from others

13  again through deceit and lies.  So whatever sentence the Court

14  decides to give her, it must entail something on her record so

10:37:08  15  that her future potential victims have some clue that she's not

16  a person who can be trusted.

17    Thank you.

18    THE COURT:  Thank you.

19  Anyone else, Mr. Silvio?

10:37:23  20    MR. SILVIO:  That's it, Your Honor.  Thank you.

21    THE COURT:  All right.

22  Mr. Geist.

23    MR. GEIST:  Thank you, Your Honor.

24    Sabrina lied, she stole money, she betrayed the trust of

10:37:42  25  obviously good people, people who wanted to help her, and she

1    did this for years, between 2013 and 2018.

2        Sabrina read every single victim impact statement that was

3    presented.  And then, together, we read those, and I read them

4    to her.  She understands the harm that she's caused.  She

10:38:07  5    understands the money that she stole.

6        What she's expressed to me, as well, is that just because

7    her crime stopped in 2018 doesn't mean that the pain that the

8    victims have felt has stopped.  That pain includes not just to

9    them, but to their family members, to their friends, and future

10:38:32  10   relationships that they may not have because of the lies that

11   she told to them.

12       The harm that she did to them is real, and it's going to

13   continue probably for the rest of their lives, that betrayal of

14   trust.

10:38:51  15       When the Court listens to Sabrina, maybe the Court

16   shouldn't rely on anything that she says.  Maybe the Court

17   should not believe anything that she says when fashioning its

18   sentence, and Sabrina's prepared for that.

19       What we're asking is for the Court to look at what Sabrina

10:39:14  20   has done and accomplished since 2018.  Those are things that we

21   can look at and determine what is real and what is not.  So

22   let's look at her actions since 2018.  Let's filter that through

23   this Court's knowledge of the many fraud cases that have come

24   before this Court with some clients having multiple different

10:39:42  25   lawyers throughout the course of their case, some going to

1    trial.

2        Sabrina never claimed that she did not lie or steal money

3    when confronted.  Let's look at February 2019.  She told one of

4    the victims in a message that she lied and committed a crime.

10:40:02    5    Let's look at the day that the -- and this is before she was

6    investigated.  This is before FBI agents showed up to her door

7    November 2nd, 2021.  They knocked on her door, she let them in,

8    and she confessed to committing crimes to the FBI agents.

9        This was an interview that she knew not if it would happen,

10:40:25    10    when it would happen.  She knew it was just a matter of when.

11    She told the agents she didn't have a paying job between 2015

12    and 2018.  She told them she was never diagnosed with MS.  She

13    admitted to the agents that she lied about the reasons she

14    needed money, and that she lied about her ability to repay

10:40:47    15    people.  She admitted what she spent the money on, trips,

16    things, and drugs.

17        She also told the agents that she started counseling and

18    sought counseling and started receiving prescription medication

19    to help her deal with her mental health issues.  And she started

10:41:06    20    to receive that proper medication in about 2019 or 2020.  That's

21    what she told the FBI agents in November 2021.

22        By the time of her initial appearance here in this

23    courthouse, November 15th, just about a couple weeks after the

24    FBI agents showed up at her door, she had already talked with

10:41:27    25    me.  They had given her the summons, the FBI agents did, and she

1    reached out to my office.

2        She was adamant from the beginning that she wanted to plead

3    guilty.  At her initial appearance on the 12th floor, I relayed

4    Sabrina's wishes to the prosecutor in court.  Later that same

10:41:49   5    day, at Sabrina's urging, I sent an e-mail to that same AUSA.

6    The e-mail said that Sabrina wanted to waive her right to a

7    speedy indictment and that she was prepared to move forward

8    because she wanted to plead guilty and accept responsibility for

9    what she did.  She wanted to make the process as easy and as

10:42:10  10    straightforward for the government to both convict her and to

11    spend as little resources on prosecuting her, convicting her,

12    and coming to court here today.

13        But I think, more importantly, what she relayed and what I

14    relayed to the government is that she hoped that the victims

10:42:30  15    would see that she recognized she betrayed their trust and

16    committed a crime.

17        Then, just a month later, now equipped with this knowledge,

18    I have tried in other cases to see whether restorative justice

19    would be appropriate.  This seemed like a good opportunity not

10:42:51  20    for Sabrina, not to help her, but because she's telling me she

21    knows that there are victims who are hurt.  And without her

22    knowledge of what restorative justice was totally, I thought

23    that this would be a good opportunity.

24        So about a month later, on December 17th, 2021, Sabrina

10:43:10  25    asked me to reach out to the government, because I had reached

1   out to Collective Justice Northwest.  That's an amazing

2   community resource that helps survivors through accountability

3   processes and healing circles.  I contacted the AUSA and I told

4   him Sabrina wanted to see what could be accomplished through a

5   restorative justice process with the hope that the process would

6   help the victims.

7        At that point, I decided to step aside and let social

8   workers deal with it.  Sabrina asked me, I do not want this to

9   appear that I am trying to get off with something or get

10   anything taken lightly here.  So I stepped aside as much as I

11   possibly could and we had our social worker within the Federal

12   Defender's Office and a social worker from New York who came

13   together, and they had reached out to each of the victims and

14   invited them to participate.

15        In the meantime, Sabrina, on her own, decided to engage in

16   a circle -- circle for those who caused harm, and that allowed

17   participation to engage in a rigorous process of unpacking the

18   dynamics that led to harm and dialoging with community members

19   that experienced similar harm.

20        Sabrina participated in this group for six months.  I think

21   it was weekly, I think it was for three hours each time.  And

22   from my understanding, she was the only person in that circle

23   who had caused harm.

24        This was important for her and in her learning how lies,

25   deceit, stealing harms not just the individual, but also all the

10:43:31
10:43:47
10:44:07
10:44:33
10:44:53

1    people around them in the community.

2        After she participated in the circle with Collective

3    Justice Northwest, that's when we reached out to the victims to

4    see if they wanted to participate in that circle led by two

10:45:14    5    social workers.  One came forward and participated.  He said he

6    went into the circle expecting Sabrina would not take personal

7    responsibility or admit fault for her actions.  He did not think

8    that she was capable of personal growth.

9        After he engaged in that process, he said that Sabrina

10:45:38    10    proved him wrong.  He went in extremely skeptical and his

11    feelings changed.  After meeting with Sabrina, he had hoped for

12    a future filled with forgiveness, understanding, compassion, and

13    trust.  He could see the changes in Sabrina, and he said he

14    could tell a difference.  He came away from the circle with the

10:46:02    15    opinion that prison purely punitive and locking someone away

16    does not create the opportunity for healing or repentance.

17        His request, one of the victims, is for Sabrina to receive

18    probation.  That would allow her to continue her growth while

19    working and paying the retribution.  And he said he hoped

10:46:24    20    Sabrina would have the opportunity to continue growing and

21    developing.

22        Just a few years ago, Sabrina would not have been able to

23    demonstrate this type of growth to any victim of her crimes.

24        But how did she get here?  What is it that she decided to

10:46:43    25    do to change?  One of the most important things that she did is

1    she decided she needed to get proper medication and counseling.

2    She decided to find work to earn money.  She decided to come

3    forward, admit her lies, and admit that she had stolen.  She

4    also decided that she wanted to open up a space for victims to

5    cope.  And if they wanted to meet with her, she would meet with

6    them in a moderated, restorative justice circle, not for her

7    benefit, but for the benefit of the victims.

8        And, Your Honor, no matter the outcome of the sentencing

9    today, Sabrina wanted me to relay to the Court, to each victim

10   here in the courtroom, to anyone listening on the phone who's

11   been harmed by Sabrina, that whether it's in a day, a month, a

12   year, a decade, whenever it is, she is willing to meet with them

13   in a moderated, restorative justice circle for their benefit.

14   All they have to do is either reach out to the government, the

15   government can reach out to me or reach out to my office.

16       And the reason Sabrina decided she wanted to change is

17   important.  She wanted to put herself in a position where she

18   would not commit the crimes that she committed.  She didn't want

19   to create the same conditions where she was lying, stealing,

20   betraying trust.  She wanted that to stop, and that's where we

21   are now.

22       Since 2018, when these offenses stopped, we have a

23   sustained period of time in which Sabrina has stabilized her

24   mental health, and she remains committed to keeping that

25   stability.

1      Her psychiatrist is in the courtroom today, from my

2  understanding.  Her therapist has written a letter.  She has an

3  appointment today at 1:00 with her therapist, to meet with her

4  therapist, and continue doing things that show the type of

10:48:56  5  growth that she hopes to gain so that there will never be a

6  victim again.

7      And she's getting sentenced now, not in 2018, the

8  sentencing is happening in 2023.

9      So what do we know?  We know she admitted her lies.  In her

10:49:15  10  own words to the Court, she said she lied and stole money from

11  people who cared about her.  She lied to those who went out of

12  their way to help her, and she hurt people with her actions.

13  She lied to people about why she needed financial help, and she

14  filled her life with materialistic things.

10:49:36  15      What else do we know?  We know that one victim believes

16  she's sincere and wants to give her a chance without a prison

17  sentence.  We know that she has found medication to help her

18  stabilize.  She's working with a therapist.  And through her own

19  words, she said that she has learned that she needs to heal

10:49:52  20  herself to help those she harmed.

21      Prison presents unacceptable risks, Your Honor.  It does.

22  And while there have been prosecutions of people who have harmed

23  women in prison, and we know that there's a problem with sexual

24  assault, it's still an unacceptable risk.  The problem has not

10:50:19  25  been solved.  But we also know that Sabrina will not be helped

1    by the BOP in the same way as if we continue with what we're

2    doing now.  In the BOP, she will not receive therapy.  She will

3    not receive the medications that help her.  And as I said

4    before, she'll be placed in the BOP, an entity that is unable to

10:50:46    5    protect women from sexual assault by its own employees.

6        If she's sentenced to prison, she is going to be subject to

7    the same conditions that for the past four or five years she's

8    been trying to escape from, that she's been trying to correct

9    from when she committed these crimes and lied to the victims.

10:51:10    10        We have a proposal to the Court that is a lengthy period of

11    probation and supervision, a longer period of supervision

12    requested by the government or the probation office, 60 months

13    of probation.  If Sabrina at any point violates, she would be

14    back before this Court facing the same exact sentence that the

10:51:39    15    government and probation have recommended today, probably more.

16    We're requesting one year of home detention with electronic

17    monitoring.  She would be required to stay inside of her home,

18    and she would only be able to leave if she got permission well

19    in advance.

10:52:00    20        That is a form of punishment that would also provide

21    Sabrina with treatment in the most effective manner.  It would

22    be a shame for Sabrina to make this growth and for this

23    continuity to be cut off and for her to be when she -- if she

24    gets a prison sentence, for her to be released from prison

10:52:23    25    without a home, without the continuity of treatment, without the

1    continuity of medication.

2    And during those five years of probation that we are

3    recommending, we can look at the success that she's had on

4    supervision.  Pretrial officer said that she has complied with

10:52:42    5    her supervision for about 15 months now.

6    There's a middle ground here, Your Honor, that does provide

7    punishment with a year of home detention and even longer

8    supervision to give the people here in the courtroom, the

9    victims and those listening, those who can't be here, some

10:53:03    10    assurance that this probation office will be watching everything

11    that she does.  They will watch her bank accounts, they will

12    watch her job, and they'll make sure that she's receiving proper

13    treatment and medication.

14    I do know that Sabrina would like to address the Court,

10:53:29    15    Your Honor.

16    THE COURT:  Mr. Geist, thank you.

17    Before we get to her comments, let me ask the probation

18    officer if she would have anything she'd like to include this

19    morning.

10:53:33    20    Ms. Moore, good morning, thank you for your very thorough

21    report, as always.

22    Having heard from the attorneys, at least two of our

23    victims, I know you read all the victim impact statements, as

24    well, is there anything else you would like to say today?

10:53:43    25    U.S. PROBATION OFFICER MOORE:  Your Honor, I don't

1   have much else to add.  I would just note at the time I

2   submitted my material, I didn't have the benefit of the victim

3   impact statements.  Of course, I was able to read them this past

4   week and even last week as they came in.  And I felt they were

5   very impactful, very compelling.  And I think that they truly

6   capture not only the financial harm in this case, but the

7   emotional impact and harm to the victims.

8       For the reasons set forth in my memorandum, I think 27

9   months is appropriate, especially in recognition of the victims.

10              THE COURT:  Thank you.

11                      (Off the record.)

12              THE COURT:  Counsel, we need a moment.  Our phone

13  lines went down, so our IT people came in and they got it back

14  up and running.  I think we're going to try and see if we can

15  tie everybody back in.  Hopefully, they're still on.

16                      (Off the record.)

17              THE COURT:  All right.  Counsel, let's go ahead and

18  proceed.

19      Ms. Taylor, there's no requirement today that you say

20  anything at all.  Court's read everything you said, including

21  your statements as well; however, you have an absolute right to

22  address the Court before the Court determines what the

23  appropriate sentence is here.  If you would like to say

24  something, now is the time.

25              MR. GEIST:  Would Your Honor like her to remain

1    seated?

2              THE COURT:  No.  She can step up to the podium,

3    please.

4              THE DEFENDANT:  Good afternoon, Your Honor.  Good

10:55:51    5    afternoon, everyone.

6         I lied.  I lied and I used people and money and resources

7    to cover up for stupid things, for things that I should have

8    never sought out.  I have no way of atoning verbally for what I

9    have done.

10:56:19    10        I am aware of the pain that I have caused.  I know that I

11    have made people hurt in ways that no one should hurt.  And I

12    have worked very hard to make sure that I am a person who will

13    never do the horrible, disgusting things I've done.

14        I am more ashamed than I can ever admit, and I honestly

10:57:04    15    cannot tell you from the bottom of my heart how sorry I am, how

16    much I know I've robbed you of things that no one had any right

17    to take from you, how I hurt you in ways that a friend should

18    never hurt you.

19        I am -- I am but one person and I have caused so much pain,

10:57:32    20    and I know the Court has no right -- or reason to believe a word

21    I say.  I understand that my words do not carry much weight.  I

22    believe that my actions have shown that I am trying every day

23    and choosing every day to not be that person ever again.

24        Thank you, Your Honor.

10:58:07    25              THE COURT:  Thank you.

1    Mr. Geist, the probation department recommends eight

2 special conditions in their report.  Does Ms. Taylor object to

3 any one of those conditions?

4    MR. GEIST:  No, Your Honor.

5    THE COURT:  Thank you.

6    Counsel, every sentence, every sentencing, every defendant

7 is a unique case.  They're all different.  In my more than three

8 decades on the bench, I've never seen two exactly situated --

9 similarly situated individuals ever in thousands of sentencings.

10    The Court has reviewed everything, carefully, submitted by

11 all parties.  The Court finds that there is no disagreement

12 amongst the parties regarding the calculation of the guideline

13 range the Court has utilized here.

14    The total offense level works out to be 20.  She has no

15 accountable criminal history, therefore falls in criminal

16 history Category 1.

17    Congress has set the potential penalties for wire fraud and

18 the advisory range set by the sentencing guidelines systems

19 would be 33 to 41 months.  There are no mandatory minimums that

20 the Court must consider.

21    The Court has looked at all of the aggravating and

22 mitigating circumstances in this particular case.  The parties

23 present two starkly different perspectives of the underlying

24 behavior and where the defendant finds herself at this point in

25 time.

10:58:40
10:59:08
10:59:38
11:00:03
11:00:38

The facts are clear and undisputed, the defendant carried out an extensive criminal fraud for at least five years, using deceit, deception, and unrelenting manipulation of numerous individuals, two of them we heard here today, for the most base motive of all, greed. And while many of her victims suffered and continue to suffer financial hardship as a result of her scheme, perhaps never to be made whole, her long-term lies and manipulation took something even more important from them, she exploited, abused, and betrayed the trust relationships that she so intricately cultivated with each of those individuals. She used their compassion, their caring nature against them. That emotional impact on the victims may very well be the most long-lasting damage that she has inflicted.

She tells a tale of growing up basically almost as an abused child, corporal and strict punishment from her parents, treatment of her male sibling totally different from hers. Unfortunately, the facts also seem to be undisputed that the defendant is a pathological liar who can't be believed as to anything she says, unless it's independently corroborated.

When probation reached out to the parents, they could not corroborate the story that Ms. Taylor spun.

Counsel, considering all of the aggravating and mitigating circumstances here, the Court will impose the following sentence:

She will be placed on three years of supervised release

1    once she finishes her custodial time.

2        During that three-year period of time, she is to follow all

3    of the standard conditions of probation as well as the eight

4    special conditions set out in Ms. Moore's report.  Those eight

5    conditions will be set out exactly as spelled out in her report.

6        Let me just briefly summarize each of those for purposes of

7    our record today:

8        Number one, the defendant shall not be self-employed or

9    employed by friends, relatives, associates, or people previously

10   known to her unless approved by U.S. Probation.  The defendant

11   will not accept or begin employment without the specific prior

12   approval of U.S. Probation;

13       Number two, the defendant shall provide probation with

14   access to all requested financial information, including any

15   authorization necessary to conduct credit checks, obtain copies

16   of any income tax returns filed;

17       Number three, the defendant shall disclose all assets,

18   liabilities, to probation.  And she is not to transfer, sell,

19   give away nor otherwise convey any asset without first

20   consulting with probation;

21       Four, if she maintains an interest in the future in any

22   business or enterprise, she shall, upon request, surrender

23   and/or make available for review any and all documents and

24   records of that business to probation;

25       Five, if so directed by probation, she will participate in

1   a mental health program approved by probation;

2       Number six, restitution in the amount of $608,975 is due

3   immediately, any unpaid amount to be paid during the period of

4   supervision in monthly installments of not less than 10 percent

11:05:32   5   of gross monthly household income.  Interest on that amount

6   shall be waived.

7       Seven, the defendant shall participate as instructed by

8   U.S. Probation in a program approved by them for treatment of

9   addiction, drug dependency, or substance abuse, which will,

11:05:53   10   obviously, include testing to determine if she's reverted to

11   using drugs or alcohol.  Throughout the period of supervision,

12   she shall abstain, not use any alcohol or any other intoxicants;

13       And the final special condition, the defendant shall submit

14   her person, property, residences, storage units, vehicles,

11:06:21   15   computers, any other electronic communications or data storage

16   devices to searches conducted by U.S. Probation at a reasonable

17   time, in a reasonable manner, based upon reasonable suspicion of

18   contraband or evidence of a violation of a condition of

19   supervision.

11:06:43   20       The Court waives the imposition of any fine, finding she

21   does not have the current financial ability to pay a fine and

22   would rather focus on her paying back restitution.

23       The only other monetary penalty is a special assessment by

24   statute, by law the Court may not waive that, that is $100 for

11:07:11   25   every felony count.  There's a single count here, it will be set

1    at the minimum, $100.

2        That only leaves amount of custodial time to impose in this

3    case.  As I said at the very beginning, every case is different,

4    every case is unique, but there's no doubt that in this

5    particular case, this defendant intentionally and deliberately

6    cultivated long-term relationships with many of her victims,

7    taking advantage of that compassion, that trust, that caring

8    nature, that benevolence that we would like all humans to have,

9    and all to take vacations, buy things, and for her own benefit.

10        The guideline provisions call for 33 to 41 months.  The

11   Court agrees with the parties that it can go below the guideline

12   range.  In this case, the Court is imposing 27 months of

13   custody, credit for any time served up 'til now.

14        Mr. Geist, are you asking for placement at any particular

15   facility?

16            MR. GEIST:  We don't have particular placement, Your

17   Honor.

18            THE COURT:  All right.

19            MR. SILVIO:  And, Your Honor, one last thing before I

20   present the J&S to Mr. Geist.  I've noted that the preliminary

21   order of forfeiture, Docket 46, is incorporated in the Court's

22   judgment.

23            THE COURT:  Thank you, Mr. Silvio.  I forgot to

24   mention that.  I had it written down.  The Court will

25   incorporate that order of forfeiture.

1          MR. SILVIO:  Permission to approach defense counsel.

2          THE COURT:  You may.

3                    (Off the record.)

4          MR. GEIST:  Your Honor, the judgment conforms with

11:09:44  5  your ruling.

6      May I approach?

7          THE COURT:  Please.

8      Counsel, two final matters for the record.

9          Number one, the Court has reviewed the judgment form, made

11:12:04  10  a couple of minor changes to it, but otherwise it conforms to

11  the Court's decisions.  It's been dated, signed, and may be

12  filed with our clerk.

13          Number two, I would point out that I believe it's paragraph

14  17 of the parties' Plea Agreement waives the defendant's right

11:12:25  15  to appeal the sentence or any aspect of the sentence, so long as

16  the Court imposed a custodial sentence that was within or below

17  the guideline range and the Plea Agreement calls for, as long as

18  the Court went with a sentence of 27 months or less, or no more

19  than 27 months, and the Court did, in fact, impose that

11:12:45  20  sentence; therefore, the terms of that paragraph will apply.

21          And, Counsel, while the Court has great difficulty and

22  great skepticism of believing anything that this defendant says,

23  she has indicated in the past several times suicidal ideation

24  and threatened suicide as a way of getting money from her

11:13:14  25  victims.  The Court cannot take the risk; therefore, she's

1    remanded into custody today.  The U.S. Marshals will take her

2    from the courtroom.

3          Thank you, all, very much.

4              MR. GEIST:  Your Honor, may I be heard on that issue?

5              THE COURT:  No, thank you, Mr. Geist.

6          We'll be at recess.

7              THE CLERK:  All rise.

8          Court is in recess.

9                    (Court at recess at 11:13 a.m.)

10                   C E R T I F I C A T E

11    I certify that the foregoing is a correct transcript from

12    the record of proceedings in the above-entitled matter.

13              /s/ Marci E.C. Chatelain

14              Marci E.C. Chatelain, CCR, RPR, RMR, CRR
               Federal Court Reporter

15

16

17

18

19

20

21

22

23

24

25

11:13:27